IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

WILLIAM PENDERGRASS                                        PLAINTIFF

v.                          Civil No. 10-2089

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, William Pendergrass, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI")  under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.    Procedural Background:

The plaintiff filed his applications for DIB and SSI on October 2, 2007, alleging an onset date of February 27, 2007, due to left ankle pain and swelling, right shoulder pain, colon problems, stomach pain, diabetes, depression, sleeplessness/fatigue, poor memory, and poor concentration.  Tr. 92-94, 95-99, 106, 129-130, 135-140, 161-167.

A hearing was held on February 23, 2009.  Tr. 23-40.  Plaintiff was present and represented by counsel.  At this time, plaintiff was 44 years of age and possessed an eleventh grade education.  Tr. 27, 36-37, 111.  He had past relevant work ("PRW") experience as a truck driver and cabinet finisher. Tr. 17, 35-36, 107, 113-120, 142-149.

AO72A
(Rev. 8/82)

On April 16, 2009, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's diabetes mellitus, peripheral artery disease, atherosclerotic vascular disease, hypertension, right shoulder and left ankle pain, and history of depression did not meet or equal any Appendix 1 listing. Tr. 11-13. She found that plaintiff maintained the residual functional capacity ("RFC") to perform a range of sedentary work not involving work above shoulder level and requiring only simple, repetitive tasks with incidental contact with the public. Tr. 13-16. With the assistance of a vocational expert, the ALJ then found that plaintiff could still perform work as an inspector/checker, escort driver, assembler, and miscellaneous laborer. Tr. 17-18.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on May 14, 2010. Tr. 1-3. Subsequently, plaintiff filed this action. Doc. # 1. This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. Doc. # 8, 9.

## II.   <u>Applicable Law:</u>

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id*. As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742,

2

747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A.   The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age,

3

education, and work experience in light of his or her residual functional capacity.  *See McCoy*

*v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.    Evidence Presented:

Records dated outside the relevant time period reveal that Plaintiff had a history of

treatment for constipation, hypertension, stomach/abdominal pain, irritable bowel syndrome,

diabetes, tobacco dependence, pain in the shoulder and surgery on his shoulder, an ankle mass,

and alcohol/drug abuse.  Tr. 178-351, 433-438, 500.  In October 2004, his HgA1c was high at

11.3.  Tr. 186.  Further in April 2005, Plaintiff tested positive for cannabis.  Tr. 202.  His

medications were said to include Dicyclomine, Ranitidine, Enalapril, Metformin, and Aspirin.

Tr. 503.

In December 2005, Plaintiff was hospitalized at Brookhaven Hospital for major

depressive disorder and alcohol dependence.  Tr. 268-330.  He reported significant problems

with insomnia, decreased interest, decreased energy, poor focus and concentration, poor appetite,

a 45 to 50 pound weight loss in the previous four months, and feelings of hopelessness and

helplessness.  Plaintiff also complained of significant anxiety and reported a history of vague

psychotic symptoms when smoking marijuana, increasing paranoia, and seeing spirits or demons

when awakened from sleep.  Records indicate Plaintiff had a significant history of alcohol

dependence, which increased following his wife's death in July 2004, but he stated that he had

stopped drinking in December 205.  Plaintiff had also smoked marijuana almost daily until

November 2005. He had significant guilty over his wife's death because they were both drinking

heavily and she died of alcohol poisoning. Plaintiff was admitted to the behavioral health unit

for his depression.  He was administered Trazadone, Prozac, Campral, Prozac Lunesta, and

4

Temazepam.   Over his hospital course, his mood slowly improved and he tolerated his medications without significant side effects.  Due to the cost prohibition regarding the Lunesta, Plaintiff was switched to Restoril and discharged on January 6, 2006.  Tr. 268-330.

On December 5, 2006, a CT of Plaintiff's thorax revealed small lung nodules, most likely granulomas.  Tr. 460.  Focal bulging involving the right ventricle was also noted, so correlation was recommended for a possible aneurysm.  Tr. 460.  A CT scan of his abdomen and pelvis also revealed small low attenuation lesions in the head of the pancreas.  Tr. 461, 462.  Further, an acute abdominal series showed artherosclerotic vascular disease as manifested by bilateral iliac artery calcifications, but was otherwise unremarkable.  Tr. 463.

On February 23, 2007, Plaintiff complained of a large boil on the left side of his buttocks that had been present for at least three months.  Tr. 491-499.  He also reported left lower abdominal pain, constipation, nausea, vomiting, and difficulty eating.  His bowel sounds were normal with diffuse tenderness.  Daniel Dause, an Advanced Practical Nurse, diagnosed Plaintiff with an abscess on his buttock and anemia.  He prescribed Cotrimoxazole DS and a Ceftriaxon injection.  Tr. 491-499.  An abdominal series revealed only moderate stool.  Tr. 459.

On March 14, 2007, Plaintiff reported continued upper left and right quadrant pain that felt like he had a "sticker" in his intestines.  Tr. 484-490.  He also reported constipation.  Records indicate that he needed diabetic testing supplies, but had not been testing his blood sugar at home as directed.  An examination revealed good movement in al extremities, normal speech, and normal affect.  No joint swelling or edema were noted.  Plaintiff was diagnosed with chronic abdominal pain, constipation, normocytic anemia, hypertension, and diabetes mellitus. Metformin, Enalapril, and  HCTZ were again prescribed.  Plaintiff also requested a stronger

5

medication for his stomach, but refused it unless it could be supplied through the W. W. Hastings Indian Hospital.  He was also upset to learn that Dr. Nolan would not be prescribing him any pain medication, as the doctor believed this was causing Plaintiff's constipation.  Tr. 484-490.

At this time, Plaintiff also signed an agreement acknowledging that the glucose meter, test strips, diabetes medications, and cholesterol medications were costly items that were being provided free of charge.  Tr. 483.

On March 19, 2007, Plaintiff was a no show for an upper GI.  Tr. 431.

On March 27, 2007, Plaintiff failed to show for a CT scan of his chest, abdomen, and pelvis.  Tr. 430.

On April 16, 2007, Plaintiff complained of chronic left lower quadrant pain and constipation. Tr. 426, 481.  He reported dis-impacting himself and inducing vomiting with some pain relief.  Plaintiff was diagnosed with chronic abdominal pain and prescribed Zantac and Tylenol 3.  Tr. 426.  His other medications were noted to include Enalapril, HCTZ, and Metformin.  Tr. 428.

On April 23, 2007, Plaintiff presented with chronic right shoulder pain for the previous two years.  Tr. 477-480.  He was taking no medication for this.  Plaintiff also indicated that he was not currently taking his Metformin as it made him weak and shakey.  Further, he had been out of his hypertension medications for a month.  An examination revealed a decreased range of motion with internal rotation in the shoulder.  Decreased external rotation was also noted.  Plaintiff was diagnosed with chronic right shoulder pain and hypertension secondary to noncompliance.  He as prescribed HCTZ and Enalapril.  The Tylenol 3 was discontinued and Plaintiff was advised to take NSAIDs, but refused.  Tr. 477-480.

6

On May 3, 2007, Plaintiff was reportedly doing better on Zantac, but he was taking two at a time once per day.  Tr. 424.  He also complained of difficulty urinating.  Tr. 473-475.  An examination was normal.  Dr. Douglas Nolan recommended he take the Zantac twice daily.  He also noted that Plaintiff's CT scan showed only stable lower lobe lung nodules.  Tr. 457.  X-rays were also  negative showing only stable bilateral renal cysts and degenerative changes of the spine.  Tr. 456.  There was no significant change in the subcentimeter low density regions within the pancreatic head and uncinate process.  Tr. 456.  He prescribed Zantac and Tylenol 3, as well as increased fiber and water intake.  Tr. 424.

On May 16, 2007, Plaintiff presented at the Sam Hider Community Clinic with complaints of stomach pain and diabetes.  Tr. 412.  He stated that he needed to establish care. Plaintiff told the medical professional that he was using a heating pad for his stomach pain, which helped, and that he was also suffering from constipation. He was diagnosed with abdominal pain not otherwise specified, Type II diabetes, and hypertension.  He was prescribed Tylenol 3, Reglan, and HCTZ.  Tr. 412.

On May 24, 2007, Plaintiff underwent a psychosocial assessment with Annette Chin, a Licensed Professional Counselor at Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Tr. 352-354.  Plaintiff reported attempting suicide by overdosing on Tylenol with Codeine.  He stated that this was precipitated by his girlfriend saying she was leaving him.  His wife had passed away three years prior in July, and he worried about dealing with the anniversary of her death.  Plaintiff had a history of depression and alcohol and marijuana dependence and continued to binge drink.  He was experiencing poor sleep, decreased interest, poor appetite, decreased concentration, and increased guilt and depression.  Plaintiff reported a history of suicide attempts

7

with a prior admission to Brookhaven.  Ms. Chinn noted that it was questionable whether Plaintiff had any family support and was also questionable as to whether he was motivated toward treatment since he reported that he did not know if he would continue to take his medication once discharged.  She noted that Plaintiff would be encouraged to participate in individual and group therapy to receive support for his treatment.  Tr. 352-354.

When evaluated by Dr. Carolyn Baxter at the Laureate Psychiatric Hospital, Plaintiff denied intentionally taking an overdose of medication, instead stating he had merely miscounted. Tr. 354-359.  He did, however, admit to being upset with his girlfriend and experiencing guilt, poor sleep, lack of interest, and poor appetite and concentration.  Plaintiff also admitted to smoking marijuana almost daily since his wife's death and binge drinking.  Dr. Baxter found him to have an appropriate mood for the situation, an appropriate affect, fluent and normal speech, normal thought processes, coherent and appropriate thought content, intact memory, and average intelligence.  She diagnosed him with major depressive disorder, alcohol abuse and dependence, hypertension, and diabetes.  Dr. Baxter assessed him with a current global assessment of functioning ("GAF") score of 30.  Remeron, Ultram, Campral, HCTZ, and Metformin were prescribed to facilitate his treatment.  Tr. 354-359.  It appears that he was discharged on June 26, 2007, with a GAF of 55 and prescriptions for Camprel, Prozac, and Hydrocholorathiazide.  He was directed to be seen in aftercare at Ozark Guidance Center.  Tr. 362-363.

On May 29, 2007, and June 14, 2007, Plaintiff failed to show for his upper gastrointestinal series Tr. 410-411.  On May 29th, his mother indicated that he was hospitalized in Tulsa and rescheduled for June 14.  Tr. 410-411.

8

On July 19, 2007, Plaintiff was treated at the Sam Hider Community Clinic for his type II diabetes.  Tr. 409.

On September 17, 2007, Plaintiff was treated by Dr. Thomas Luiskutty for hypertension and diabetes.  Tr. 359-361.  His medications were said to include Vasotec, Metformin, and Hydrochlorothiazide.  Dr. Luiskutty noted that Plaintiff smoked a package of cigarettes per day, drank one pint of vodka daily, and had a history of marijuana abuse.  A physical examination was normal.  Plaintiff was directed to follow-up with his primary care physician for continued medical evaluation and management.  Tr. 359-361.

On November 13, 2007, Plaintiff had a follow-up concerning his CT scan.  Tr. 422, 468-472.  He had not taken any medication for at least three months.  Tr. 470-472.  Dr. Douglas Nolan diagnosed him with uncontrolled diabetes secondary to noncompliance and essential hypertension secondary to noncompliance.  He was prescribed Aspirin, Zantac, Tylenol 3, Gylburide, Enalapril, and Dulcolax.  Tr. 422, 471.

On November 29, 2007, Plaintiff underwent a general physical exam with Dr. Neil Mullins.  Tr. 367-373.  Plaintiff complained of a history of multiple surgeries to his left ankle and right shoulder, diabetes, and chronic stomach pain.  An examination revealed a normal range of motion in all areas; a normal straight-leg raise test; "good" gait and coordination; and, no muscle weakness, atrophy, abnormalities, or deformities.  Dr. Mullins diagnosed Plaintiff with diabetes, some early peripheral vascular disease secondary to his diabetes, chronic osteoarthritis of the right shoulder, chronic osteoarthritis of the left ankle, and a possible duodenal ulcer. However, no limitations were noted.  Tr. 367-373.

AO72A
(Rev. 8/82)

On December 5, 2007, Plaintiff underwent a mental diagnostic evaluation with Dr. Terry Efird.  Tr. 375-379.  Plaintiff indicated that he had filed for disability due to his diabetes, high blood pressure, depression, and alcohol abuse.  His depression reportedly began with the death of his wife approximately four years prior.  He described his mood as trying "to keep it good/positive."  Plaintiff reported continued interest in activities, some physical limitations, fairly stable weight, minimal sleep disturbance, very low energy, and feelings of worthlessness and guilt.  He stated that his symptoms of depression had become prominent over the past three years, and although improving, they were more remarkable around certain dates (wife's birthday, anniversary, holidays).  Plaintiff admitted to four inpatient psychiatric admissions, stating he stayed for seven days in alcohol treatment in 2001, seven days for depression about two years prior, a five day stay in May 2007 secondary to a pain medication overdose, and a seven day stay the previous summer.  However, he denied being presently prescribed psychiatric medications.

Dr. Efird noted that Plaintiff was cooperative, his mood dysphoric, his affective responses appropriate to content, his thoughts logical and goal oriented, appeared to have average intelligence, and exhibited spontaneous immediate recall and quick delayed recall.  He denied any present suicidal or homicidal ideations or visual and auditory hallucinations, although he did report some visual abnormalities (seeing things out of the corner of hsi eyes) when drinking heavily.  Dr. Efird diagnosed him with depressive disorder not otherwise specified and alcohol dependence in partial remission and assessed him with a GAF of 57-67.  He found Plaintiff capable of communicating in a reasonably intelligible and effective manner, capable of performing basic cognitive tasks, able to track and respond adequately for the purpose of the

10

evaluation, capable of completing all tasks assigned during the evaluation, and able to complete most tasks within a reasonable time frame.  No remarkable slowing was noted.  Tr. 375-379.

On January 30, 2008, Plaintiff was again treated at the Sam Hider Community Clinic for his diabetes.  Tr. 407.

On February 1, 2008, Plaintiff was admitted to the hospital after falling twice in the Salvation Army parking lot, where he was currently staying.  Tr. 511-526.  He stated that he "kinda" hurt his right chest/shoulder and left flank, rating the pain as a seven on a ten-point scale. In addition, Plaintiff indicated that his stomach hurt and felt as though it contained cement.  He reported difficulty eating and sleeping, though nausea and vomiting were denied.  He thought he might have hepatitis.  As the nurse walked into the room, she observed Plaintiff shoving his fingers down his throat to vomit.  An examination revealed a normal range of motion in his neck and upper extremities and no abnormalities evident.  A drug screen was positive for cannabis. A CT scan of Plaintiff's abdomen and pelvis revealed small bilateral renal low-density areas, probably cysts; an enlarged prostate and a fracture of the right ninth rib costochondral junction region of indeterminate age.  Tr. 509-510.  X-rays of his upper extremities showed no fractures or dislocations.  Tr. 515.  An x-ray of his right shoulder showed advanced degenerative changes. Tr. 523.  Plaintiff was diagnosed with shoulder pain and arthritis.  Tr. 511-526.

On February 14, 2008, Plaintiff was treated for a boil on his back and abdominal pain. Tr. 419-421.  He reported nausea and vomiting once per week and a history of constipation problems.  Plaintiff was diagnosed with acute abdominal pain, constipation, and diabetes.  He was prescribed Bactrim DS and mineral oil, and a CT was ordered.  Tr. 419-421.  X-rays of his abdomen revealed moderate colonic stool without obstruction.  Tr. 455.

11

On July 21, 2008, Plaintiff sought emergency treatment for right ankle pain, which he rated as a seven on a ten-point scale. Tr. 583-601. He reported a sprain to the right ankle. Swelling was moderate, distal pulses were intact, and the capillary refill was less than two seconds distal to the injury site. The foot was warm to the touch and very painful. His pain was exacerbated by movement and relieved by over-the-counter medications. Following x-rays, Plaintiff was diagnosed with an acute fracture to the right distal tibia. His foot was splinted with an ortho glass splint and Plaintiff was prescribed crutches. He was released home with a prescription for Percocet. Tr. 583-601.

On September 10, 2008, Plaintiff was again treated for acute abdominal pain, constipation, and acute gastritis. Tr. 555-582. He rated his pain as an eight on a ten-point scale. Palpation of the abdomen elicited tenderness in all quadrants. A normal range of motion was noted in all joints. A chest x-ray showed no acute disease, while abdominal x-rays revealed a significant amount of stool. Following diagnoses of acute abdominal pain, constipation, acute gastritis, and acute hypoglycemia, Plaintiff was discharged home with Phenergan and instructions to obtain follow-up care within three days. Tr. 555-582.

On September 17, 2008, Plaintiff was admitted for acute pancreatitis of unclear cause, diabetes, and hypertension. Tr. 528-554. He complained of abdominal pain, and was noted to have high amylase and lipase levels upon admission. Initially, food seemed to worsen his symptoms. Plaintiff was given Morphine Sulfate PCA with aggressive IV hydration. A CT scan was unremarkable for pancreatitis, however, Plaintiff exhibited tenderness upon light epigastric palpation. His prostate remained enlarged and renal cysts were present. His pain gradually improved and the PCA was discontinued. Plaintiff was started on a clear liquid diet with no

12

problems.  He was advanced to a low fat diet without difficulty.  A gallbladder ultrasound was unremarkable for stones.  Plaintiff was discharged on September 19, 2008, tolerating a low fat diet and ambulating with stable vital signs.  He was prescribed Gylburide, Aspirin, Zantac, Enalapril, and Ultram.  Tr. 528-554.

## IV.   **Discussion:**

Plaintiff contends that the ALJ erred by relying upon the findings of a non-examining doctor's reports over that of treating and consulting examiners, finding Plaintiff to be in noncompliance with treatment, and in failing to include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert.  We will begin our analysis of this case by reviewing Plaintiff's subjective complaints and the evidence presented in support of his claims.

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  *See id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).  However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence

13

as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

We note that plaintiff has been diagnosed with type II diabetes. However, the medical evidence indicates that Plaintiff was not always compliant with treatment. Tr. 422, 468-472, 484-490. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). He has also failed to seek out consistent treatment for his diabetes, and even testified at the administrative hearing that his diabetes was under control. Tr. 32-33. *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling); *See Edwards*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).

In reviewing the record, we can find no evidence to indicate that Plaintiff has suffered from complications associated with his diabetes or that his condition has required hospitalization to stabilize. No neuropathy, acidosis, or retinitis roliferans has been noted, as is required by Listing section 9.09. In fact, there is no evidence Plaintiff's doctors have ever limited his ability to perform activities based on his diabetes. *See Baldwin v. Barnhart*, 349 F.3d 549, 557 (2003) (physicians noted few abnormalities, and none of Plaintiff's independent physicians restricted

14

or limited P's activities).  As such, while we do agree that this impairment is severe, we do not find it to be disabling.

Plaintiff also suffers from hypertension, which his doctors have noted to be uncontrolled due to noncompliance.  *See Dunahoo*, 241 F.3d at 1038.  Again, there is no evidence to indicate that his hypertension required emergency treatment or hospitalization to stabilize or control. Further, we can find no evidence to indicate that this condition has limited Plaintiff's ability to perform work-related activities.

We do note that Plaintiff has been diagnosed with peripheral artery disease and atherosclerotic vascular disease, but can find no evidence to show that Plaintiff was consistently treated for these conditions during the relevant time period.  There is no evidence to even suggest that he was taking medications to treat these conditions.  Accordingly, although severe by their nature, we can not say that they interfered with his ability to perform sedentary work.

The record also indicates that Plaintiff frequently complained of abdominal pain with accompanied constipation.  However, repeated CT scans and ultrasounds were normal.  Plaintiff was prescribed Prilosec, Nexium, and Prevacid for his pain.  At one point, Plaintiff did request stronger medication to treat his condition, but when told he would have to obtain it from a location other than W. W. Hastings Indian Clinic, Plaintiff refused to do so.  This unwillingness to receive his medication from another location seems to contradict Plaintiff's complaints of severe pain.  Further, records indicate that the nursing staff caught Plaintiff making himself vomit on at least two occasions while hospitalized for stomach related symptoms.  Tr. 426, 511-526.

15

We also note that Dr. Nolan seemed to think Plaintiff's constipation was caused by the pain medications that had been prescribed and refused to refill these medications.[1] Tr. 484-490.

Although Plaintiff was, on one occasion, diagnosed with pancreatitis, he only exhibited a positive physical exam and elevated Amilayse and Lipase levels.  Other laboratory testing and CT scans were negative.  We note that Plaintiff was hospitalized for only two days and released.  No further diagnoses or treatment was had for this condition.

Plaintiff contends that he suffered from the residuals of surgery to his right shoulder, but we can find no evidence to support a finding that this impairment was disabling.  X-rays conducted in February 2008 revealed advanced degenerative changes, but records do not indicate that Plaintiff consistently sought treatment for this condition.  Tr. 523.  Plaintiff actually sought out treatment for shoulder pain on only three occasions.  *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).  And, while a physical exam in April 2007 revealed a decreased range of motion in the shoulder with internal and external rotation, a general physical conducted in November 2007 yielded a normal range of motion in all areas, as did an examination in 2008.  Tr. 367-373.  Therefore, while severe and somewhat limiting, we can not say that this impairment is totally disabling.

The evidence does also establish that Plaintiff had undergone several surgeries to his ankle and had sustained an acute fracture to the right distal tibia in July 2008.  However, a general physical in November 2007 revealed no range of motion limitations, joint abnormalities, deformities, instability, muscle weakness, or muscle atrophy.  Tr. 371.  His gait and coordination

---

[1]Records indicate Plaintiff became upset by his doctor's refill refusal.

16

were normal. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). Thus, while we believe that his history of injury to his feet limited him to some degree and probably made standing and walking for long periods of time very difficult for him, we do not believe this condition alone or in combination with his other impairments rendered him disabled.

As for Plaintiff's claim of mental impairment, we note that Plaintiff did not seek out consistent mental health treatment for his problems. He was hospitalized in December 2005 for depression and again in May 2007. However, Plaintiff was not taking any medication for his condition and was not involved in mental health treatment. The lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

Plaintiff contends that his failure to seek consistent treatment for his impairments and to take medication as prescribed should be excused due to his financial situation. We note, however, that Plaintiff obtained treatment from clinics that offered services to indigent individuals. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty). In fact, in March 2007, Plaintiff signed an agreement acknowledging that the glucose meter, test strips, diabetes medications, and cholesterol medications were costly items that were being provided to him free of charge. Tr. 483. Clearly, not a financial burden on Plaintiff.

17

Contrary to another of Plaintiff's arguments, it seems clear to the undersigned that Plaintiff's ability to seek out and obtain indigent care and free medication and supplies for his condition hinders rather than helps his contention that his alcoholism and depression clouded his insight and judgment concerning his medical care, rendering him incapable of obtaining proper treatment and medication.

And, while we are cognizant of the fact that Plaintiff lived at the Salvation Army[2], at least for a period of time, we are also aware of his tobacco, alcohol, and marijuana use. Had Plaintiff's impairments been as severe as alleged, we do believe Plaintiff could have given up his cigarettes, alcohol, and marijuana in order to obtain more consistent treatment and medication. *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (considering fact that Plaintiff continued to smoke three packs of cigarettes a day , in spite of contention he could not afford medical treatment and medication). As such, we do not find that his financial situation justifies his failure to obtain medical treatment or take his medication as prescribed.

Plaintiff's reported activities also undermine his claim for disability. On October 29, 2007, Plaintiff completed an Adult Function Report on which he reported the ability to care for his personal hygiene, occasionally prepare meals, do the laundry, vacuum, perform general cleaning activities, go outside everyday, walk, use public transportation, go out alone, drive, shop in stores, count change, watch television, fish, read, speak to others on the phone, and look for part-time work. Tr. 121-125. On March 7, 2008, Plaintiff completed another adult function

---

[2] While we would agree that a diabetic diet is difficult to follow in a homeless shelter, we do not believe that Plaintiff's failure to follow the diet, alone, was used by the ALJ to find him in noncompliance. Rather, it was Plaintiff's failure to take his medication as prescribed and to check his blood sugar readings as directed, in spite of receiving free testing supplies and medication, that the ALJ found to be noncompliant behavior.

AO72A
(Rev. 8/82)

report indicating that he also attended Bible Study/Chapel, although he continued to state he did not like being around others. Tr. 150-157. However, in May 2007, Plaintiff had told Ms. Chin that he had several friends with whom he enjoyed going fishing. Tr. 352-353. Plaintiff also reported to Dr. Efird the ability to drive, shop independently, handle personal finances satisfactorily, interact with people at the Salvation Army shelter, and perform activities of daily living autonomously. Tr. 378. Further, it is noted that Plaintiff had a girlfriend and even testified that he wanted to go back to school to become a technician and a plumber. Tr. 353. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, these activities do not support plaintiff's claim of disability.

Therefore, although it is clear that plaintiff suffers from some degree of impairment, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that

AO72A
(Rev. 8/82)

substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

We next turn to the ALJ's determination that plaintiff had the RFC to perform sedentary work that did not require work above shoulder level and involved only simple, repetitive tasks with incidental contact with the public.  RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  *Id*.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, plaintiff's testimony regarding his daily activities, and the functional limitations set forth by the physicians.  On December 11, 2007, Dr. David Hicks prepared a physical RFC assessment.  Tr. 380-387.  After reviewing all of Plaintiff's medical records, he concluded Plaintiff could perform a full range of medium work.  Tr. 380-387.

On January 7, 2008, Dr. Dan Donahue completed a psychiatric review technique form and a mental RFC assessment of Plaintiff.  Tr. 388-405.  He, too, reviewed only Plaintiff's

medical records and diagnosed Plaintiff with depression and a substance abuse disorder. He was of the opinion that Plaintiff would be moderately limited with regard to activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; understanding, remembering, and carrying out detailed instructions; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted by them; completing a normal workday and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work place; and, setting realistic goals or making plans independently of others. One or two episodes of decompensation were noted. Tr. 388-405. This assessment was later affirmed by Dr. Charles Bridges. Tr. 506. Further, we find that this assessment matches Dr. Baxter's assessment of Plaintiff's GAF at 55[3] at the time he was discharged from Laureate Psychiatric Hospital in May 2007. Tr. 362-363.

On March 25, 2008, another consultative examiner completed an RFC assessment. Tr. 507. After reviewing Plaintiff's records, he also concluded Plaintiff could perform medium work. Tr. 507.

Plaintiff contends that the ALJ erred by relying upon the findings of a non-examining doctor's reports over that of treating and consulting examiners. However, after reviewing all of the medical evidence of record, we find no merit in this argument. The consultative examiner

---

[3]The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. Kluesner v. Astrue, 607 F.3d 533, 535 (8th Cir. 2010). A GAF of 55 is indicative of only moderate symptoms. *See* Diagnostic and Statistical Manual of Mental Disorders IV-TR 34 (4th ed. 2000).

21

found no range of motion limitations in Plaintiff's elbows, wrists, hands, ankles, shoulders, or hips. Further, no muscle spasms, joint abnormalities, or deformities were noted. Muscle strength, gait, and coordination were all found to be within normal limits. And, Plaintiff could stand and walk without assistive devices, walk on his heels and toes, and squat and arise from a squatting position. Tr. 371. Further, in the end, he concluded Plaintiff had no limitations with regard to walking, standing, sitting, lifting, carrying, handling, fingering, seeing, or speaking. Tr. 373.

An examination in February 2008, when Plaintiff alleged to have fallen and injured his shoulder, revealed a normal range of motion with only crepitus. Tr. 512. X-rays showed only advanced degenerative changes. Then, in September 2008, a physical examination revealed a normal range of motion in Plaintiff's joints and extremities, no swelling or deformities, and no cyanosis, clubbing, or edema. Tr. 547. Neurologically, Plaintiff exhibited no motor or sensory deficits. Tr. 547. Medical personnel observed that Plaintiff moved all four extremities equally with equal strength with no evidence of numbness or tingling. Tr. 550.

While we note that none of Plaintiff's treating doctor's provided an RFC assessment, we also note that Plaintiff did not obtain consistent medical treatment from any one doctor. Further, in the treating records that have been provided, we can see no evidence to indicate that Plaintiff's treating doctor's placed any restrictions on his ability to perform work-related activities based on his impairments. Accordingly, we believe the ALJ's RFC assessment is supported by substantial evidence.

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work as an inspector/checker, escort driver, assembler, and miscellaneous laborer. The

AO72A
(Rev. 8/82)

vocational expert testified that an individual with Plaintiff's RFC could perform these positions.

*See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Plaintiff alleges that the ALJ failed to include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert. However, we disagree. Giving Plaintiff the benefit of the doubt and crediting his complaints of both ankle and shoulder pain coupled with the limitations arising from his diabetes, peripheral artery disease, atherosclerotic vascular disease, hypertension, and depression, the ALJ correctly crafted a hypothetical question to the VE regarding Plaintiff's ability to perform a limited range of sedentary work. We do not find that the ALJ's mere failure to specifically list pain in his RFC assessment, when that assessment already takes the claimant's pain into account, renders the assessment improper. Thus, given Plaintiff's daily activities, as well as his own testimony that he wanted to go back to school to be a technician and a plumber, we find no error in the ALJ's hypothetical. Tr. 353.

**V.**     **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus recommends that the decision be affirmed, and plaintiff's Complaint be dismissed with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

AO72A
(Rev. 8/82)

DATED this 27th day of April 2011.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

24